IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| KATHLEEN STANLEY MCCAFFERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-965 (RDA/IDD) |
| | ) | |
| FAIRFAX COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendant Fairfax County's Motion for Summary Judgment (Dkt. 50) (the "Motion"). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with the Memorandum in Support (Dkt. 51), Opposition (Dkt. 58), and Reply (Dkt. 61), this Court GRANTS-IN-PART and DENIES-IN-PART the Motion for the reasons that follow.[1]

## I. PROCEDURAL BACKGROUND

On July 21, 2023, Plaintiff Kathleen Stanley McCaffery initiated this action. Dkt. 1. On August 7, 2023, Plaintiff filed an amended complaint. Dkt. 3. Following briefing, on September 4, 2024, this Court granted-in-part and denied-in-part Defendant's motion to dismiss.[2] Dkt. 30. On September 30, 2024, Plaintiff filed a second amended complaint. Dkt. 32. On October 2,

---

[1] Except with respect to citations to transcripts of deposition testimony, all page number citations refer to the CM/ECF assigned page numbers.

[2] Plaintiff also named the International Association of Fire Fighters ("IAFF") as a defendant in the amended complaint. *See* Dkt. 3. The Court granted IAFF's motion to dismiss, and IAFF was terminated as a defendant in this case on September 4, 2024. Dkt. 30.

2024, Plaintiff was permitted to file a third amended complaint.  Dkts. 33-35.  On October 16, 2024, Defendant filed a motion to dismiss, Dkt. 36, which the Court granted-in-part and denied-in-part on August 27, 2025, Dkt. 43.

Following discovery, on January 23, 2026, Defendant filed its motion for summary judgment.  Dkt. 50.  On February 13, 2026, Plaintiff filed her Opposition.  Dkt. 58.  On March 3, 2026, Defendant filed its Reply.  Dkt. 61.

## II.    UNDISPUTED STATEMENT OF FACTS

Summary judgment is appropriate only where there are no genuine disputes of material fact. *See* Fed. R. Civ. P. 56.  To this end, Defendant, in compliance with Rule 56 and Local Rule 56, set forth a statement of material facts in separate enumerated paragraphs that Defendants contends are undisputed and supported by record citations.  The Rules next required Plaintiff to respond to Defendants' statement of undisputed fact by "listing all material facts to which it is contended that there exists a genuine dispute" with citations to the record.  L.R. 56(B).  And the Rule 16(b) Scheduling Order in this case further directed Plaintiff, as the non-movant, to use numbered paragraphs corresponding to the movant's section and specifically state whether Plaintiff admits or disputes each fact with appropriate citations to the record.  Dkt. 48 ¶ 10f. Plaintiff was warned that "[t]he Court may assume that any fact identified by the movant as undisputed in the movant's brief that is not specifically controverted in the non-movant's brief in the manner [so] set forth . . . is admitted for the purpose of deciding the motion for summary judgment."  *Id.*  Here, Plaintiff largely failed to comply with these directives.  For example, in her responses to a fact, Plaintiff would repeatedly state that she did not dispute certain aspects of a large group of Defendant's asserted facts but then asserted additional facts herself, many of which were not supported by a record citation.  Plaintiff also set forth her own "Statement of Facts."  Dkt.

2

58 at 11. Neither the Rules nor case authority permit this. *See Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 981 (E.D. Va. 2017); *Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773, 777–78 (E.D. Va. 2021) (refusing to consider a plaintiff's separate enumerated statement of facts opposing summary judgment), *vacated and remanded on other grounds sub nom. ImmunoGen, Inc. v. Hirshfeld,* 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) (recognizing that it "is from [the movant's] statement of undisputed facts and the nonmovant's response that a district court determines whether genuine issues of fact are disputed"). Nonetheless, the Court takes into account Plaintiff's asserted facts where appropriate and, even where not recounted below as undisputed facts, the Court considered all of the facts proffered by Plaintiff in reaching a decision.

Accordingly, the following statement of facts is derived from a careful review of (i) Defendant's statement of undisputed facts; (ii) Plaintiff's response to those facts; and (iii) the summary judgment record as a whole. The undisputed facts are as follows:

1. Plaintiff was hired by the Fairfax County Fire and Rescue Department ("FRD") in January 1995 and promoted through the ranks throughout her career. Ultimately, Plaintiff was promoted to Battalion Chief in June 2011.

2. From January 2011 to March 2016, Plaintiff was detailed out of the FRD for a fellowship with the National Counter Terrorist Center ("NCTC") and the Northern Virginia Regional Intelligence Center ("NVRIC").

3. In October 2012, Plaintiff sustained a work-related injury that rendered her permanently unable to perform the essential functions of an operational Battalion Chief with the FRD.

4. Fairfax County (the "County") policy permits employees within the Uniformed Retirement System who become disabled as a result of a work-related injury, such as Plaintiff, to work in an Alternative Placement ("AP") position in lieu of separating from employment on disability retirement.

5. Following her work injury, Plaintiff returned to her fellowship with NVRIC and NCTC, which included working for the Joint Counter-Terrorism Assessment Team ("JCAT") as an operations officer, beginning in April 2013.

6. On March 19, 2016, Plaintiff's fellowship concluded and she was assigned to work at FRD headquarters as the Battalion Chief of Special Projects.

3

7. Shortly thereafter, Chief Richard Bowers assigned Plaintiff to serve as the interim Women's Program Officer ("WPO") for the FRD and, in July 2016, her position description was revised accordingly.

8. Plaintiff's duties as the WPO were to be the face of women in the FRD and to advocate for women and women's issues within the FRD, including specifically in meetings with senior staff.

9. Plaintiff was one of only two Battalion Chiefs invited by Bowers to attend senior staff meetings.

10. When Plaintiff assumed the role of the WPO, Bowers "told her he was prioritizing everything about women as an issue," and that he wanted to get her what was needed so she could do the job of the WPO.

11. Upon returning to the FRD headquarters, Plaintiff was also placed on a committee to secure the bid to host the International Association of Women in Fire & Emergency Services ("iWomen") conference in May 2018 (the "iWomen Conference Committee").

12. On December 27, 2016, Plaintiff reached out to Bowers to ask whether the FRD's tight budget would affect their efforts to secure the bid to host the iWomen Conference. Bowers answered affirmatively and told her, "the importance of getting numerous sponsors is job one."

13. In contrast with concerns regarding budgetary constraints and the significant need for sponsorships that Bowers was discussing internally with the iWomen Conference Committee, including Plaintiff, he "sold limitless resources" to iWomen to secure the bid to host the conference.

14. In February 14, 2017, the County received an Organizational Climate Review Report ("Climate Review") from an outside consulting firm, Titan Group, that the County had hired in August 2016 to review and assess the workplace environment and culture in the FRD.

15. To ensure accountability and appropriate follow-up on the recommendations in the Climate Review, the County created an Executive Review Committee.

16. The Executive Review Committee created multiple workgroups tasked with creating action plans to address issues identified in the Climate Review. To that end, Deputy County Executive Rohrer and Chief Bowers worked closely with the Executive Review Committee and the various workgroups.

17. On February 22, 2017, Plaintiff sent an e-mail to County Executive Edward Long, Jr. and Deputy County Executive David Rohrer, sharing her feedback regarding the Climate Review. Rohrer responded on the same day with an invitation for Plaintiff to meet with him and the Executive Review Committee to share her perspective.

18. Plaintiff accepted Rohrer's invitation and she, along with several other women from the FRD, met with the Executive Review Committee on April 7, 2017.

19. Following her meeting with the Executive Review Committee, Plaintiff contends that she was subjected to retaliation in the form of "large, easy-to-remember incidents," as well as "hundreds of little, tiny slights."[3]

20. Specifically, according to Plaintiff, the retaliation against her began on April 17, 2017, when Deputy Chief Daniel Gray and approximately four other unidentified Deputy Chiefs left a recruit orientation meeting when she was speaking.[4]

21. Throughout her tenure as WPO, Plaintiff admits that there were numerous occasions on which FRD employees, including senior staff, genuinely wanted to help her and would reach out with sincere offers of assistance.

22. Plaintiff contends, however, that, while Bowers and other members of senior staff were professional and polite in e-mails, they retaliated against her by avoiding engaging with her in-person unless it was necessary to do so for work purposes.

23. Plaintiff further contends that she was treated "harshly" after her meeting with the Executive Review Committee. Specifically, Plaintiff heard "snarky" comments, none of which were sufficiently significant to be memorable to her, and attended meetings that were "contentious."

24. Plaintiff also contends that she was treated "harshly" in relation to her request for data associated with women's trends in the FRD.

25. In March 2017, the County secured the bid to host the iWomen conference, and Plaintiff was assigned to assist with that endeavor as the Liaison Officer.

26. Beginning in March 2017, Plaintiff made requests for data associated with women in the fire service. The data requested by Plaintiff had not previously been compiled nor did it exist in a single database from which the information could be easily extracted.

---

[3] Defendant asserted the following fact: "Following her meeting with the Executive Review Committee, Plaintiff contends that she was subjected to retaliation in the form of what she refers to as numerous 'little, tiny slights.'" Dkt. 51 ¶ 20 (citing Dkt. 51-1 at 458). Plaintiff disputed this fact, arguing that Plaintiff stated, "There were large, easy-to-remember incidents, and there were hundreds of little, tiny slights." Dkt. 58 at 4 (citing Dkt. 59-3 at 458). After reviewing the cited testimony, the Court finds that Plaintiff's recounting of the testimony is accurate, and the fact has been modified accordingly.

[4] In her Opposition, Plaintiff states that "Paragraphs 21-25 are defendant's characterizations of some of Plaintiff's contentions, not statements of material fact as required by Rule 56." Dkt. 58 at 4. But these paragraphs recount relevant facts, as supported by Plaintiff's statements and admissions, and Plaintiff does not otherwise dispute their accuracy. Accordingly, these paragraphs are properly included.

27. Instead, it was Plaintiff's expectation that the FRD would get the information requested from "anywhere they could," and that the FRD's statistical analysts should have been able to compile the data.

28. In response to Plaintiff's requests, employees within the FRD and Fairfax County Department of Information Technology ("DIT") began compiling data. That data came from official County databases, including Department of Human Resources ("DHR") payroll databases, which are only accessible to trained and authorized users.

29. The FRD assigned Lieutenant Natalie Robb to assist Plaintiff with this project, and together they undertook the task of compiling data regarding women in the FRD from a variety of sources.

30. In May 2017, Rohrer determined that a multi-agency data workgroup was necessary to accurately collect and analyze the data on women in the FRD for use by the Cultural Review workgroups and he communicated with Plaintiff regarding the same in May 2017.

31. Plaintiff admits that she did not ask to be a member of the data workgroup.

32. Although Plaintiff did not ask to be a member of the data workgroup and was not a trained/authorized user with access to the County's various DHR databases, she continued her data collection initiative using other sources of information, including: a box of documents, which Plaintiff referred to as "the mother lode of historical data on women;" FRD recruit class photos; FRD informational bulletins and General Orders, which Plaintiff found to be unhelpful because they were incomplete and/or inaccurate; and the FRD's staffing database, which Plaintiff found to be unhelpful for many reasons.

33. From May 2017 through January 2018, the data workgroup gathered and analyzed data from multiple sources, and created numerous datasets, ultimately culminating in a final data set comprised of the names and employment information for every woman who had served in the FRD from 1990-2012.

34. Plaintiff admits that she contemporaneously received such datasets throughout the time the data workgroup was gathering/analyzing the data, including the final dataset, which was provided to Plaintiff via an email from Assistant Chief John Caussin on September 27, 2017.

35. After the data workgroup finalized its analysis regarding women in the fire service, the FRD continued to comb through various data sources for additional information.

36. Plaintiff contends that she was retaliated against in connection with an anonymous complaint of time and attendance fraud that was made against her to the County's Internal Audit Office ("Internal Audit") on September 18, 2017.

37. Specifically, the anonymous complaint alleged that Plaintiff was routinely late for work, left early from work, or failed to show up for work.

6

38. Pursuant to the County's PM No. 02-04, Internal Audit is charged with promptly investigating allegations of suspected fraud.

39. Agency management is not permitted to internally investigate fraud.

40. Included in PM 02-04 is a definition of "fraud," which includes "[s]erious abuse of County time such as unauthorized time away from work, falsification of work hours reported, or excessive use of County time for personal business."

41. County Personnel Regulations Chapter 10.4, which is applicable to all County employees, requires that employees request advance approval for leave that is not unscheduled sick leave.

42. FRD Standard Operating Procedure 02.00.03 provides that employees who are unable to report to work at the beginning of their workday are required to notify their supervisor at least one hour prior to their scheduled reporting time with the reason for their tardiness and an estimated time of arrival.

43. In connection with its investigation, Internal Audit reviewed Plaintiff's time and attendance records from September 2016 to September 2017 and interviewed Deputy Chief Knerr, Chief Bowers, and Plaintiff.

44. During the Internal Audit investigation, it was discovered that, prior to the anonymous complaint, there were multiple instances in which Plaintiff was not at work and had failed to notify her supervisor, Deputy Chief Joseph Knerr, that she would not be at work.

45. As Plaintiff's supervisor, Knerr was responsible for approving her time and attendance in FOCUS, the County's time and attendance system. Plaintiff admits that it was important for Knerr to know the work and leave status of the employees for whom he was responsible for certifying time and attendance.

46. Prior to the anonymous complaint, Knerr had communicated to Plaintiff his expectation that she regularly notify him regarding her leave; a request to which Plaintiff agreed.

47. Ultimately, the Internal Audit investigation concluded that the anonymous complaint against Plaintiff was unsubstantiated for time and attendance fraud but identified opportunities and set forth recommendations for FRD to strengthen controls for the oversight of work schedules and leave requests. Such recommendations included, for example, allowing supervisors to have access to Battalion Chiefs' calendars and the proper reporting of work schedules.

48. As a result of the Internal Audit investigation, Knerr communicated to Plaintiff that she was required to let him know if she was working somewhere other than her assigned work location.[5]

---

[5] In her Opposition, Plaintiff asserts that she was "ordered to begin reporting her travel and departure every shift to Deputy Chief" and that "none of the male administrative BCs were

49. Caussin reiterated that requirement in an email to Plaintiff on June 9, 2018, wherein he explained by way of example that if she was going to be working off-site, she need only create an event in her Outlook calendar to which he had viewing access.

50. After the Internal Audit investigation, Plaintiff admits that there were instances in which she failed to provide the required notification regarding her time and attendance, but she was never disciplined for it.

51. Plaintiff attributes this new reporting requirement to the anonymous complaint investigated by Internal Audit.

52. On January 29, 2018, Plaintiff sent an email to Bowers asking to resign from the WPO position.

53. In her resignation email, Plaintiff stated that she wanted to resign from the WPO position because her "style of leadership and [her] views and values towards change do not coincide with [Bowers'], or the current leadership of the Department."

54. Prior to sending her resignation email to Bowers, Plaintiff forwarded it to the "FIRE - Uniformed Women" distribution list, which included all of the female uniformed FRD employees. Plaintiff gave the recipients permission to further publicize the resignation email and invited them to do so.

---

subjected" to this requirement, citing her EEOC Charge of Discrimination in which she asserts these claims under penalty of perjury. Dkt. 58 at 4 (citing Dkt. 59-1 ¶¶ 22-23). Because Plaintiff later contradicted the first assertion in her sworn deposition testimony, this assertion is not well-taken at this stage. *See* Dkt. 61-1 at 309:1-6 ("Q. And so, it was inaccurate to say that you had to report your daily arrival and departure times, correct? You only had to report if you weren't going to be in the office; isn't that right? A. Okay."); *In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011) ("[I]t is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct."). To the extent Plaintiff asserts that male administrative BCs were likewise not subjected to providing daily reports of their arrivals and departures, the second assertion appears irrelevant given Plaintiff's deposition testimony. To the extent Plaintiff asserts that male administrative BCs were not required to let Knerr know if they were working off-site, Plaintiff provides no basis for any personal knowledge over this assertion, and the assertion is thus speculative and conclusory and insufficient at this stage. *See Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence" cannot create genuine issues of material fact); *Nat'l Enterprises, Inc. v. Barnes*, 201 F.3d 331, 335 (4th Cir. 2000) (finding "self-serving affidavit" insufficient to defeat motion for summary judgment); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (plaintiff's affidavit "mostly made up of conclusory statements . . . without more is not enough to establish a *prima facie* case of discrimination"). Accordingly, there is no genuine dispute of material fact.

55. Ultimately, Plaintiff's resignation email was sent to the media and became public.

56. After Plaintiff's resignation email was made public through the press, Bowers convened a press conference on February 1, 2018.

57. Plaintiff was invited to attend the press conference by Knerr. Plaintiff was required to wait until she was off duty before she could respond to reporters' questions and was not permitted to wear her uniform while speaking to the press to defend her report.[6]

58. Plaintiff contends the press conference was retaliatory because Bowers discredited the allegations she made in her resignation email and generally denied that the problems referenced therein existed in the FRD.

59. Plaintiff also contends that the press conference was retaliatory because Bowers allowed women referenced in Plaintiff's resignation email who supported him to speak to the press in uniform while still on duty.[7]

60. Such women included Technician Alicia Reakoff, who was upset that Plaintiff mischaracterized a grievance issue that she brought forward and used it out of context to advance her own agenda.

61. On February 7, 2018, Rohrer commenced a review of the allegations set forth in Plaintiff's resignation email.

62. On March 13, 2018, the County held a press conference regarding Rohrer's review.

63. Plaintiff contends that the March 13, 2018 press conference was also retaliatory, because it was misleading in that Rohrer said Plaintiff was in possession of information that she did not want to provide.

---

[6] Defendant asserted the following fact: "Plaintiff was invited to attend the press conference by Deputy Chief Knerr, and she did so while on duty." Dkt. 51 ¶ 57 (citing Dkt. 51-1 at 433-34; Dkt. 51-45). In her Opposition, Plaintiff states that she "was required to wait until she was off duty before she could respond to reporters' questions and was not permitted to wear her uniform while speaking to the press to defend her report," citing her EEOC Charge of Discrimination. Dkt. 58 at 5 (citing Dkt. 59-1 ¶¶ 24-27). Upon review, Defendant's cited materials only support that Plaintiff was invited to attend the press conference by Knerr but do not support that Plaintiff attended while on duty. And Plaintiff's further assertions are supported by her EEOC Charge of Discrimination made under penalty of perjury. The fact has thus been modified accordingly.

[7] Defendant asserted the following fact: "Plaintiff also contends that the press conference was retaliatory because Chief Bowers allowed women referenced in Plaintiff's resignation email to speak to the press." Dkt. 51 ¶ 59 (citing Dkt. 51-1 at 432-33). In her Opposition, Plaintiff further asserts that "Bowers allowed any woman who supported him to speak to the media in uniform, while still on duty." Dkt. 58 at 5 (citing Dkt. 59-1 ¶¶ 24-27). Because Plaintiff's claim is properly supported, the fact has been so modified.

64. Plaintiff admits, however, that certain materials were requested by Internal Audit in connection with the County's review of the allegations in her resignation email, which she refused to provide on the advice of counsel.

65. After Plaintiff requested to resign from the WPO position, the FRD could not simply transfer her to a vacant Battalion Chief position because of her permanent medical restrictions and AP status.

66. On February 7, 2018, Plaintiff met with Rohrer and DHR Director Cathy Spage regarding her resignation email.

67. During that meeting, Plaintiff was offered the option of finishing the remaining thirteen months of her career with another County agency.

68. In response thereto, Plaintiff communicated that it was her preference to finish her career in the FRD.

69. On April 4, 2018, Plaintiff attended a meeting with Bowers, Caussin, and Spage to discuss her AP position.

70. Until that time, the County had not expressly communicated a response to Plaintiff's request to resign from the WPO position.

71. At the meeting on April 4, 2018, Plaintiff was asked if she wanted to remain in the FRD or be transferred to another County agency.

72. Specifically, Spage informed Plaintiff that she had already communicated with the Directors of the County's Department of Emergency Management Services ("DEMS") and Department of Public Safety Communications ("DPSC"), both of whom expressed willingness to give Plaintiff a position in their respective agencies.

    a. The two positions were an entry-level post at the 9-1-1 dispatch center and an undefined role with DEMS. Spage stated that, if she accepted one of these positions, Plaintiff would be relieved of her rank, office, and county vehicle, and that, even if she did not accept, Plaintiff would no longer serve as Battalion Chief but, instead, would assist assorted FRD personnel with random projects. Plaintiff was given no reason for this demotion from her Battalion Chief position, nor was she asked for input as to alternative assignments but was instead told that she had one week to inform the County of her choice.[8]

---

[8] Plaintiff asserts these additional facts in her Opposition, as supported by her EEOC Charge of Discrimination, made under penalty of perjury. Dkt. 58 at 5-6 (citing Dkt. 59-1 ¶¶ 33-36). Defendant did not respond to these additional facts, and the facts do not conflict with (or are directly supported by) the deposition testimony cited by Defendant for its associated proposition. *See* Dkt. 51-1 at 440:3-15. Accordingly, Plaintiff's further asserted facts have been included here.

73. According to Plaintiff, it was Spage's impression that DEMS or DPSC could be a good fit for Plaintiff given her prior experience at DPSC and NCTC.

74. On April 11, 2018, Plaintiff's attorney sent a letter to County Attorney Elizabeth Teare, declining the County's offer to transfer Plaintiff to another County agency.

75. By virtue of his position with the County, Rohrer had the authority to transfer Plaintiff to another agency if he wanted, but he did not do so because Plaintiff said she did not want to move.

76. At the time of her resignation e-mail, Plaintiff's workload consisted primarily of planning and preparing for the iWomen Conference, which was scheduled for May 22-26, 2018.

77. Plaintiff admits that, in addition to herself, there were numerous other FRD employees who made significant contributions to the planning, preparation, and hosting of the iWomen Conference.

78. Plaintiff does not contend that her assignment to continue work related to the iWomen Conference, which constituted her full-time workload after her resignation e-mail, was retaliatory.

79. Plaintiff does contend, however, that there was a retaliatory withdrawal of support for the iWomen Conference by the FRD from the time her January 29, 2018, resignation email was leaked to the press, until her attorney sent a letter to Teare on April 11, 2018, claiming retaliation on behalf of Plaintiff

80. According to Plaintiff, following the assertion of her retaliation claim on April 11, 2018, there was an increase in support for the iWomen Conference from the FRD.

81. Specifically, in the roughly two-month period after the resignation email was leaked to the press, Plaintiff claims Bowers "completely disconnected and was not giving any support whatsoever." Instead, Plaintiff claims that the iWomen Conference committee relied extensively on existing professional relationships to secure sponsorships to coordinate necessary conference resources including audio-visual ("AV") support, radios, and computers and workspace.

82. Plaintiff admits that she was aware of budgetary constraints prior to her resignation email, and that the need to secure sponsorships was repeatedly reiterated by Bowers.

83. In addition to the aforementioned email correspondence on December 27, 2016, Plaintiff admits that Bowers sent her another email on January 9, 2018, to reiterate his support for a successful iWomen Conference and said, "[l]et's work together on examining options to optimize our opportunities and to be good stewards of public funds."

84. In response to Bowers's email on January 9, 2018, the iWomen Conference committee ramped up their efforts to secure outside sponsors to coordinate necessary conference resources. Such efforts were led by Battalion Chief Jerome Williams.

85. As the committee continued to plan and prepare for the iWomen Conference, there was a continuing message of support and assurance from Bowers that the FRD would do its best to cover anything the iWomen Conference Committee could not secure via sponsorships and "to make this an effective conference."[9]

      a. Chief Bowers did not secure any sponsors for the iWomen Conference.

86. After Plaintiff's resignation email was leaked to the press, Bowers unsuccessfully attempted to secure additional grant funding from the Northern Virginia Response System to cover registration fees and costs associated with backfilling positions for employees to be detailed out of Operations for the iWomen Conference, and he assisted with the acquisition of an AV cache and an AV technician from the Virginia Department of Fire Programs ("VDFP") for the iWomen Conference.[10]

87. In response to a request from Captain Elizabeth Planchak, Deputy Chief Gregory Hunter coordinated the provision of portable radios for the iWomen Conference using the Fairfax Communications Cache.

---

[9] In her Opposition, Plaintiff states that she "disputes any implication . . . that Chief Bowers did anything more than make empty promises" because "[t]he deposition testimony cited merely affirms that Chief Bowers . . . said he would support the conference planning" and he actually "reneged on much [sic] of the resources he promised and only provided certain resources at the very last minute." Dkt. 58 at 6. These disputes over implications and vague additional assertions are not well-taken. Plaintiff does, however, specifically assert that "Chief Bowers did not secure any sponsors for the iWomen conference," citing her own declaration. *Id.* (citing Dkt. 59-16 ¶ 3). Defendant does not address this assertion, and it has thus been included.

[10] Defendant asserted the following fact: "Though the Plaintiff discounts Chief Bowers's support for the iWomen conference after her resignation email was leaked to the press, his efforts included, at the very least, continuing to attend iWomen conference planning meetings, an unsuccessful attempt to secure additional grant funding from the Northern Virginia Response System (NVERS) to cover registration fees and costs associated with backfilling positions for employees to be detailed out of Operations, and his acquisition of an audio-visual (AV) cache and an AV technician from the Virginia Department of Fire Programs (VDFP) for the iWomen conference." Dkt. 51 ¶ 86 (citing Dkt. 51-1 at 398; Dkt. 51-58). In her Opposition, Plaintiff states, "Chief Bowers did not attend planning meetings, did not attempt to secure funding for registration fees, . . . and he did not acquire the AV equipment or AV technician." Dkt. 58 at 6-7 (citing Dkt. 59-16 ¶¶ 1-3, 11-14; Dkt. 59-2 ¶¶ 5-8). Upon review, Defendant's cited materials support the propositions that Bowers unsuccessfully attempted to secure additional grant funding and assisted with the acquisition of AV support. Dkt. 51-1 at 398:2-399:16; Dkt. 51-58 at 27-30. However, Defendant's cited materials do not address whether Bowers continued to attend planning meetings, and Plaintiff's cited materials indicate that he did not do so. Dkt. 59-16 ¶ 1. The fact has been modified accordingly.

12

88. On November 1, 2017, Knerr informed Plaintiff that he was coordinating with Deputy Chief Paul Ruwe in the FRD's Support Services Division to secure workspace and computers for the iWomen Conference Committee.[11]

89. In an effort to support the request for workspace and computers for the iWomen Conference committee, Ruwe approved FRD IT to use a desktop computer that was previously assigned to Plaintiff, which was being replaced with a laptop and docking station as part of a long-established migration plan.

90. Although Plaintiff approved the swapping of her desktop computer for a laptop and docking station, she nevertheless complained that it was retaliation for someone to go into her office and "change things."

91. In response to Plaintiff's complaint about the computer swap, on November 9, 2017, Knerr explained that the swap was premised on an email exchange in which she had expressly approved it.

92. Knerr also advised Plaintiff that workspaces in the Fire Chief's Office had been assigned to the iWomen Conference Committee.

93. When Plaintiff had difficulty accessing the internet as needed for her work for the iWomen Conference on her assigned computer, a temporary workspace and computer was provided for her in the FRD's purchasing office.[12]

94. A "command room" for the iWomen Conference Committee was also provided in the Fire Marshal's Office, which is part of the FRD's Business Services Bureau.[13]

---

[11] In her Opposition, Plaintiff argues that these workspaces and computers were never provided. Dkt. 58 at 7. Plaintiff does not directly dispute Defendant's asserted fact, which is appropriately supported about what Knerr informed Plaintiff he was doing, rather than the results of any such efforts. *See* Dkt. 51 ¶ 88 (citing Dkt. 51-60). Plaintiff's argument is instead appropriately considered *infra* in relation each assertion of fact regarding support actually provided.

[12] Defendant asserted the following fact: "Thereafter, workspace and computers were also provided for the iWomen conference committee in the FRD's purchasing office." Dkt. 51 ¶ 93 (citing Dkt. 51-63). In her Opposition, Plaintiff disputes that computers were provided for the iWomen Conference. Dkt. 58 at 7-8. Upon review, the material cited by Defendant shows that Plaintiff was having difficulty accessing the internet as needed for her work on the iWomen Conference on her assigned computer and was offered to temporarily use a workstation in the purchasing office until they could find a better solution. Dkt. 51-63. The asserted fact has been modified accordingly.

[13] Plaintiff asserts that the FRD never provided a command room. Dkt. 58 at 8 (citing Dkt. 59-16 ¶¶ 4, 5). Upon review, the material cited by Defendant shows that, in her deposition, Plaintiff agreed that a command room was provided by the Fire Marshal's Office. Dkt. 51-1 at

13

      a.   The planning team was only able to secure the command room one week before the Conference, requiring the team to carry supplies, donations, building material, and planning materials with them.

95. In response to a request from Katheryn Buist, Ian Gregoire, Emergency Management Specialist for the FRD's Special Operations Division, provided the iWomen Conference with four brand new computers and a printer from May 10, 2018, through the duration of the Conference.[14]

      a.   These laptops came from the National Capital Region Incident Management Team ("IMT"), which were on tentative loan subject to the IMT's deployment.

96. Plaintiff is also claiming retaliation based on her claim that Bowers did not deliver on his initial promise to detail ten employees out of Operations the week of the conference, and five members of the iWomen Conference Committee the week before.

97. A cost breakdown prepared by Plaintiff after the iWomen Conference reflects that in addition to 200 hours of work by daywork staff employees who were not in Operations, there were also 28 24-hour shifts for which employees were detailed out of Operations for the iWomen Conference. Though there was no additional cost associated with the hours worked by daywork employees, the total cost to backfill positions for employees detailed out of Operations was $50,060.23.

98. Plaintiff admits that all the employees she requested to be detailed out of Operations were detailed out of Operations. However, these details were not approved until the week before the Conference, despite being requested three months earlier. Moreover, despite Bowers's promise that Lieutenant Kristi Bartlett, Planchak, and Buist would be detailed to work on

---

399:14-16. Accordingly, to the extent Plaintiff now seeks to dispute that admission with a declaration, her assertion is not well-taken. *See In re Family Dollar FLSA Litig.*, 637 F.3d at 512 (4th Cir. 2011). However, Plaintiff's additional assertions in her Opposition that the planning team was only able to secure the command room "one week before the conference, requiring the team to carry supplies, donations, building material, and planning materials with them" are appropriately supported, and thus have been incorporated. Dkt. 58 at 8 (citing Dkt. 59-16 ¶¶ 4, 5).

[14] Defendant asserted the following fact: "In response to a request from Katheryn Buist, Ian Gregoire, Emergency Management Specialist for the FRD's Special Operations Division, provided the iWomen conference with four brand new computers and a printer from May 10, 2018, through the duration of the conference." Dkt. 51 ¶ 95 (citing Dkt. 51-64). Plaintiff asserts that these laptops "came from the National Capital Region Incident Management Team ('IMT'), which were on tentative loan subject to the IMT's deployment." Dkt. 58 at 8 (citing Dkt. 59-16 ¶ 6). The fact has been modified accordingly.

planning the Conference full-time for two months, they were ultimately only detailed for three days.[15]

99. On February 6, 2018, Plaintiff sent an email to Knerr, requesting approval to do iWomen Conference planning and preparation work at fire station 440 on A-Shift days, because Bartlett worked in Operations at fire station 440 on A-Shift. Knerr approved Plaintiff's request.

100. Because Plaintiff was in a daywork staff position and did not work in Operations, there was no need for her to be detailed out nor were there any additional costs associated with her work at an alternate work location (i.e., fire station 440).

101. Conversely, because Bartlett worked in Operations, work at an alternate work location would have required her to be detailed out of Operations and for her position to be backfilled to meet minimum staffing requirements. In 2018, the average cost associated with of detailing a Lieutenant out of Operations and backfilling the position for a single 24-hour shift was nearly $1,000.

102. Ultimately, there were 326 people in attendance at the iWomen Conference, and Plaintiff admits that it was a successful event.

103. In addition to spending over $50,000 dollars to backfill positions for the iWomen Conference, the FRD spent an additional $12,000 on material and registration costs. In total, the FRD paid $62,420.98 to host the iWomen Conference, $15,500 of which was covered by a grant from VDFP.

104. After the iWomen Conference, Plaintiff was interviewed for the Fire Chief position, which had been vacated when Bowers retired on April 30, 2018.

---

[15] Defendant asserted the following fact: "Plaintiff admits that all the employees she requested to be detailed out of Operations were detailed out of Operations. Plaintiff nevertheless complains that she was subjected to retaliation, because the coordination and finalization of detailing employees out of Operations could have been completed sooner." Dkt. 51 ¶ 98 (citing Dkt. 51-1 at 394; Dkt. 51-67). In her Opposition, Plaintiff states, "Chief Bowers . . . did not allow three of the women planning the meetings to be detailed out of operations for two months as promised . . . ." Dkt. 58 at 6-7 (citing Dkt. 59-16 ¶¶ 1-3, 11-14; Dkt. 59-2 ¶¶ 5-8). Upon review of the materials cited, it appears that Plaintiff admitted in her deposition that the individuals that she actually requested be detailed to Knerr were ultimately detailed, albeit "[a]t the very last minute" and "after the ACLU letter." Dkt. 51-1 at 394:11-15. In her declaration, Plaintiff adds that the details were not approved until the week before the conference, despite being requested three months earlier. Dkt. 59-16 ¶¶ 11-14. A declaration from Buist also states that Bowers promised that Bartlett, Planchak, and Buist would be detailed to work on planning the conference full-time for two months, but they were ultimately only detailed for three days. Dkt. 59-2 ¶¶ 5-8. The fact has been modified accordingly.

105.        Specifically, on or around June 20, 2018, Plaintiff was interviewed by William Howland from PoliHire, LLC, a third-party executive recruitment firm that was retained by the County to lead the recruitment and selection process for the Fire Chief vacancy.

        a.   Howland told Plaintiff at the end of her interview that she was a very strong candidate, that she brought unique qualifications to the position, and that he would forward her resume to the County Executive Bryan Hill for consideration for a final interview.[16]

106.        PoliHire independently reviewed and interviewed numerous applicants for the FRD Fire Chief position.  Of the applicants initially reviewed and interviewed, Derek Baker (Division Chief of Training and Interim Training and Operations Chief, Virginia Department of Fire Programs); John Butler (Fire Chief, Howard County, Maryland, Fire and Rescue Department); Manuel Fonseca (Assistant Chief (ret.), Nashville, Tennessee, Fire and Rescue Department); Lori Moore Merrell (Senior Executive, IAFF); and Charles Ryan (Assistant Chief, FRD) were selected and referred by PoliHire to advance to a panel interview for further consideration.

107.        PoliHire did not select or refer Plaintiff to advance to a panel interview.

108.        Of the applicants who advanced to a panel interview, Butler, Merrell, and Ryan were selected and referred by the panel to advance to a final interview with Hill and the Fairfax County Board of Supervisors (the "Board").

109.        On July 10, 2018, the Board appointed Butler to serve as the Fire Chief, effective September 1, 2018.

110.        Plaintiff does not contend that she was more qualified than Butler.[17]

---

[16] Plaintiff asserts this additional fact.  Dkt. 58 at 10 (citing Dkt. 59-1 ¶¶ 52-53).  Although Defendant asserts that this statement by Howland is hearsay, because Howland was hired by Defendant to lead the recruitment and selection process, it is appropriately considered by the Court as a non-hearsay statement by Defendant's agent within the scope of the agency relationship.  Fed. R. Evid. 801(d)(2)(D).

[17] Defendant asserted the following fact: "Plaintiff does not contend that she was more qualified than Chief Butler."  Dkt. 51 ¶ 110 (citing Dkt. 59-1 at 448; Dkt. 59-81).  Plaintiff asserts that her cited deposition testimony does not support the fact and that it is otherwise irrelevant.  Dkt. 58 at 10 (citing Dkt. 59-3 at 448).  The testimony in question is as follows:

Q. Is it your contention that you were more qualified than John Butler to be fire chief?

A. I will never know because I wasn't given the opportunity to interview with them.

Q. What's the basis for any contention that you should have been selected for fire chief over John Butler?

16

111.     Plaintiff claims she was retaliated against in connection with the Fire Chief hiring process because she was not given the opportunity to compete in the final round of interviews, despite being more qualified than Merrell.

112.     After completing administrative work for the iWomen Conference, Plaintiff was transferred to the Fire and Rescue Academy (the "FRA") in July 2018.

113.     Plaintiff remained at the FRA for the remainder of her career with the FRD.

## III.  LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.  "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

---

A. I wasn't given the opportunity to compete equally.

Q. So it's not your contention that you were more qualified, only that you should have been given the opportunity to compete for the job?

A. My contention is, I was qualified as much as some of the other candidates and should have made it to the final round?

Q. Who were you as qualified as?

A. I was more qualified than Lori Moore [Merrell].

Dkt. 59-3 at 448:4-20.  The Court finds that facts 110 and 111 accurately capture this exchange.

17

IV.  ANALYSIS

Following the Court's August 27, 2025 Order granting-in-part and denying-in-part Defendant's Motion to Dismiss, there are three counts remaining in the operative complaint, all asserted under Title VII of the Civil Rights Act of 1964 ("Title VII"): (i) Retaliatory Hostile Work Environment (Count II); (ii) Denial of Promotion Based on Sex (Count III); and (iii) Retaliatory Denial of Promotion (Count IV).  Dkts. 35; 43.  In its Motion for Summary Judgment, Defendant argues that summary judgment should be granted in its favor on each of these counts.  The Court addresses each argument in turn.

A.  Retaliatory Hostile Work Environment (Count II)

To succeed on a retaliatory hostile work environment claim, a plaintiff must show "that the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to an employer." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022). The Fourth Circuit has emphasized that, although each individual instance of alleged retaliation may "not amount to much when considered in isolation, 'these determinations depend on the totality of the circumstances, as a play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario.'"  *Id.*  The Court also notes that, in considering motions for summary judgment, it "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015).

Here, there is a genuine dispute of material fact as to whether Plaintiff was subjected to a retaliatory hostile work environment.  Specifically, Plaintiff has cited record evidence indicating that, approximately a week after she submitted her resignation letter from the WPO role, she was told by the Director of DHR that she thought it best that Plaintiff finish her career outside the FRD.

18

Dkt. 59-1 ¶¶ 24, 28-29.  After the County had two press conferences publicly disputing her claims, Plaintiff was given the option of (1) an entry-level post at the 9-1-1 dispatch center, or (2) an as-yet-undefined, low-status role with the County's Office of Emergency Management.  *Id.* ¶¶ 33-34. Plaintiff was informed that she would be relieved of her rank, office, and car.  *Id.* ¶ 34.  And Plaintiff was informed that, if she refused both of these assignments, she would still no longer serve as a Battalion Chief but would instead assist assorted FRD personnel with random projects. *Id.* ¶ 35.  Plaintiff was given one week to inform the County of her decision.  *Id.* ¶ 36.  Moreover, Plaintiff has cited record evidence of a series of smaller actions that, in combination with the more severe threat of demotion, a jury could find sufficiently pervasive to support her claim, including evidence that:

- Plaintiff was berated during senior staff meetings.  Dkt. 59-1 ¶ 20.

- Senior staff walked out during her presentation to new recruits.  *Id.* ¶¶ 19-21.

- An anonymous complaint was lodged against Plaintiff alleging that she was guilty of time and attendance fraud, which, upon investigation, was revealed to be unsubstantiated.  *Id.* ¶¶ 22-23.

- Plaintiff was excluded from meetings that previously would have included her.  Dkt. 59-1 ¶ 32b; Dkt. 59-4.

- Although Plaintiff was initially approached about presenting leadership development classes, she was subsequently passed over for the position.  Dkt. 59-1 ¶ 32c.

- Plaintiff was given a defective hard drive, which interfered with her ability to access the internet.  *Id.* ¶ 32a.  Plaintiff's computer was not fixed for three months, which interfered with her ability to plan the iWomen Conference.  Dkt. 59-6; Dkt. 59-7.

- Plaintiff's requests for two-month details for personnel to assist with the iWomen Conference were denied, which made her workload to plan the Conference more onerous. Dkt. 59-1 ¶¶ 38-39; Dkt. 59-2 ¶¶ 6-9; Dkt. 59-9.

- Plaintiff was invited to participate in another city's assessment of candidates for Fire Captain, but her request for approval to participate was denied. Dkt. 59-1 ¶ 62.

A reasonable jury could find that, when considered collectively, this conduct was sufficiently pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination. *See Laurent-Workman*, 54 F.4th at 218 (holding allegations of a "series of unpredictable management decisions and acts of sabotage," ranging "from erroneous reprimands to bogus denials of professional training opportunities to the alteration of work product in a manner damaging to [the plaintiff's] reputation, on top of additional meddling" were sufficient to survive a motion to dismiss). Accordingly, the Motion will be denied as to Count II.

B.  Denial of Promotion Based on Sex and Retaliation (Counts III and IV)

Both Counts III and IV of the Third Amended Complaint are premised on Plaintiff's non-selection for the Fire Chief position, with Count III based on sex discrimination and Count IV based on retaliation.  Plaintiff relies on circumstantial evidence in support of her claims; thus, analysis under the *McDonnell Douglas* framework is appropriate.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  The Court assumes without deciding that Plaintiff met her burden of establishing a *prima facie* case of discrimination and retaliation and turns directly to whether Defendant has produced a legitimate, non-discriminatory reason for its actions and, if so, whether Plaintiff has established pretext.  *See Sempowich v. Tacitle Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021).

An employer's burden is only to "articulate" a legitimate, nondiscriminatory or nonretaliatory reason for its action and is a burden of production. *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007). A plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination or retaliation. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination" or retaliation. *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted).

Here, Defendant has met its burden of articulating a legitimate, nondiscriminatory or nonretaliatory reason for Plaintiff's non-selection; namely, that it had a good faith belief that Butler was better qualified due to his job performance and experience. Specifically, the undisputed facts show that (1) Defendant hired an outside firm to lead the recruitment and selection process for the vacancy; (2) despite Plaintiff's interviewer from the firm telling her that he would forward her resume for consideration for a final interview, the firm ultimately did not select Plaintiff to advance to even an intermediate panel interview; and (3) Butler, who was at the time the Fire Chief of Howard County, Maryland's Fire and Rescue Department and who was ultimately selected for the position, was chosen from among the candidates selected for advancement by the firm. A third-party assessment that Plaintiff was less qualified than other applicants is a valid, non-discriminatory basis for Plaintiff's non-selection. *See Evans v. Technologies Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."); *see also Hux v. City of Newport News*, 451 F.3d 311, 316-19 (4th Cir. 2006) (affirming summary

21

judgment for the employer after it chose not to select plaintiff in part based on her interview performance). Therefore, Defendant has met its burden on summary judgment.

The burden thus shifts to Plaintiff to establish that there are genuine issues of material fact suggesting that this proffered explanation is pretextual such that a reasonable jury could determine that the non-selection of Plaintiff was sex discrimination or retaliation. The Fourth Circuit has made clear that, "[i]n a failure to promote case, the plaintiff must establish that she was the better qualified candidate for the position sought." *Evans*, 80 F.3d at 960. And, "[w]hile a Title VII plaintiff may present direct or indirect evidence to support her claim of discrimination, unsupported speculation is insufficient." *Id.* Specifically, a plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact." *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). After all, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960 (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)); *see also Phillips v. Esper*, 2020 WL 3579796, at *15 (E.D. Va. June 30, 2020) (holding that a plaintiff's "self-assessment of her superior aptitude for the position fails to rebut the Government's legitimate explanation").

Under this standard, Plaintiff has failed to meet her burden. Plaintiff cites no record evidence, beyond her own conclusory opinion, that she was at least as qualified or more qualified than Butler. And, as explained *supra*, Plaintiff's opinion is insufficient at summary judgment. Indeed, as Plaintiff's deposition testimony demonstrates, when asked, Plaintiff did not affirmatively state that she was more qualified than Butler—who was ultimately selected—and only contended that she was more qualified than Merrell (a woman) who was also referred for an interview over Plaintiff. Dkt. 59-3 at 448:4-20. Instead, Plaintiff claims she was discriminated

22

and retaliated against in connection with the Fire Chief hiring process because she was not given the opportunity to compete in the final round of interviews who was selected to participate. As a preliminary matter, Plaintiff's theory of recovery based on a lack of opportunity to compete was not raised in the instant or any of the three prior complaints and is, thus, inappropriate to consider for the first time at this stage. Moreover, in support of her theory, Plaintiff argues only that "a plaintiff may claim an *injury in fact* from the purported denial of the ability to compete on an equal footing against other candidates for a job," and that "courts do not inquire into the plaintiff's qualifications (or lack thereof) when assessing *standing*." Dkt. 58 at 27-28 (emphasis added) (citing *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993) (addressing Article III standing); *Cerrato v. S.F. Cmty. Coll. Dist.*, 26 F.3d 968, 976 (9th Cir. 1994) (finding standing but affirming judgment in favor of defendants); *Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015) (same)). But whether a plaintiff has *standing* is a separate inquiry from whether a plaintiff has met her burden at summary judgment regarding pretext. And, as articulated *supra*, the Fourth Circuit's requirements at this stage are clear. Here, Plaintiff has presented no evidence, beyond her own conclusory opinion, that she was more qualified than Butler. *See Evans*, 80 F.3d at 960. Additionally, even considering Plaintiff's inability to compete theory, based on the record before the Court, any inference of sex discrimination is undermined by: (i) the fact that Plaintiff fails to allege any sex-based bias on behalf of the third-party selection firm; and (ii) the fact that the third-party selection firm did refer Merrell—a woman—for an interview. Furthermore, to the extent Plaintiff's inability to compete theory is based on retaliation, any inference is undermined by the fact that the third-party selection firm made the referrals for the interview and there is no evidence on this summary judgment record that the third-party selection firm had any knowledge of Plaintiff's protected activities. *Roberts v.*

23

*Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) ("[W]e conclude that Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity."). Accordingly, Plaintiff has failed to meet her burden as to pretext, and summary judgment will be granted to Defendant on her denial of promotion claims.

## V.  CONCLUSION

Accordingly, it is hereby ORDERED that the Motion (Dkt. 50) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted as to Counts III and IV. The Motion is denied as to Count II; and it is

FURTHER ORDERED that, at the appropriate time, the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on Counts III and IV of the Amended Complaint; and it is

FURTHER ORDERED that, within FOURTEEN (14) DAYS of the issuance of this Memorandum Opinion and Order, the parties are DIRECTED to contact the chambers of U.S. Magistrate Judge Ivan D. Davis to schedule a settlement conference; and it is

FURTHER ORDERED that, within FOURTEEN (14) DAYS of the settlement conference with Judge Davis, the parties are DIRECTED to file a joint notice indicating whether: (i) the parties have reached a settlement as to Count II; or (ii) the parties request a final pretrial conference to schedule a trial with respect to Count II. If the parties request a final pretrial conference, the filing shall: (i) notice a hearing on an agreed-upon Wednesday date; (ii) state the expected duration of the trial; and (iii) provide the parties' availability for trial in August-October 2026.

It is SO ORDERED.

Alexandria, Virginia
May 14, 2026

_____ /s/ _____
Rossie D. Alston, Jr.
United States District Judge

24